# United States Court of Appeals
# for the Federal Circuit

---

**GREGORY C. JAMES,**

*Plaintiff-Appellant*

**v.**

**J2 CLOUD SERVICES, LLC, ADVANCED MESSAGING TECHNOLOGIES, INC.,**

*Defendants-Appellees*

---

2017-1506

---

Appeal from the United States District Court for the Central District of California in No. 2:16-cv-05769-CAS-PJW, Judge Christina A. Snyder.

---

Decided: April 20, 2018

---

KEITH VOGT, Oak Park, IL, argued for plaintiff-appellant. Also represented by DANIEL CHARLES COTMAN, OBI ILOPUTAIFE, Cotman IP Law Group, PLC, Pasadena, CA.

GUY RUTTENBERG, Ruttenberg IP Law, PC, Los Angeles, CA, argued for defendants-appellees. Also represented by BASSIL GEORGE MADANAT.

---

Before REYNA, TARANTO, and HUGHES, *Circuit Judges.*

TARANTO, *Circuit Judge.*

In this action against j2 Cloud Services, LLC and Advanced Messaging Technologies, Inc. (AMT), Gregory James asserts a claim for correction of inventorship under 35 U.S.C. § 256, as well as various state-law claims. The district court dismissed the correction-of-inventorship claim for lack of jurisdiction and, consequently, dismissed the state-law claims. We reverse the jurisdictional dismissal and remand for further proceedings.

I

Mr. James alleges in his complaint that he is the sole inventor of the subject matter claimed in U.S. Patent 6,208,638, which names Jack Rieley and Jaye Muller as the inventors. The '638 patent, which Messrs. Rieley and Muller applied for on April 1, 1997, describes and claims systems and methods "for accepting an incoming message over a circuit switched network and transmitting it over a packet switched network." '638 patent, Abstract. More particularly, the patent describes the conversion of an incoming facsimile or voicemail message into a digital representation, which is then forwarded to an email address associated with the account holder's phone number. *Id.*, col. 3, lines 47–61, col. 5, line 66 through col. 6, line 54. The application that issued as the '638 patent was originally assigned to JFAX Communications, Inc., the company owned by Messrs. Rieley and Muller at the time of the invention. At present, the '638 patent is assigned to AMT, and j2 has an exclusive license to it. The patent expired on April 1, 2017.

Mr. James alleges that in November 1995 he was introduced to JFAX's Mr. Rieley, who asked Mr. James to develop software that would provide JFAX with three functionalities—"Fax-to-Email, Email-to-Fax, and Voicemail-to-Email." J.A. 37. At that time, Mr. James alleges, he agreed to "create and develop original software solutions and systems" and began working, and "[n]obody

at JFAX provided input about how" the work was to be done. *Id.* According to the complaint, Mr. James successfully tested a Fax-to-Email system on December 25, 1995, and the next month he traveled to New York to install it. J.A. 38.

On February 11, 1996, Mr. James and Mr. Rieley, as representatives, signed a contract between their principals detailing the work to be done. J.A. 53–57. The agreement was between JFAX, for which Mr. Rieley signed, and GSP Software, "a partnership of professional software developers and independent contractors," for which Mr. James signed. J.A. 53, 57. The parties and the district court refer to this contract as the "Software Development Agreement" (SDA)—whose preamble states that it reflects the parties' "Agreement on the terms by which" GSP "will develop software solutions for the exclusive use of JFAX." *Id.* The SDA (which states that it is governed by Delaware law) does not mention patent rights, whereas it expressly requires the assignment to JFAX of "all copyright interests" in the developed "code and compiled software." J.A. 55.

According to the complaint, from February to August 1996, Mr. James, while in New York, developed and deployed all three JFAX systems, which included software and hardware components covered by the '638 patent.[1] J.A. 38–42. "The technical aspects of the code, functionality and operation of the system[s] were all conceived and implemented by [Mr.] James," he contends, and the only input provided by JFAX "was that JFAX needed a system." J.A. 37, 40–41.

---

[1]    Mr. James alleges that the initial development of the Fax-to-Email system occurred in November and December 1995 while he was in Australia. The system was completed soon afterward in New York.

Mr. James alleges that on August 30, 1996, he assigned all copyrights in code and compiled software to JFAX, but he "did not assign any patent ownership or inventorship rights." J.A. 42. He adds that he was not aware of the '638 patent until "November 2013 when he was contacted by attorneys representing one of the defendants" in a suit brought by JFAX (or perhaps a successor) alleging infringement of the '638 patent. J.A. 43.

On August 3, 2016, Mr. James brought the present action. The operative (first amended) complaint asserts a claim for correction of inventorship under 35 U.S.C. § 256, along with state-law claims for unjust enrichment, conversion, misappropriation, and unfair competition. In October 2016, j2 and AMT filed a motion requesting, among other things, that the case be dismissed on the ground that the court lacks jurisdiction because Mr. James has no Article III standing to bring the action.[2]

On December 19, 2016, the district court agreed with the Article III standing argument and granted the motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. It concluded that Mr. James lacks a stake in the controversy because he "fail[ed] to allege facts sufficient to show that he has an ownership or financial interest in the '638 patent." *James v. j2 Cloud Servs. Inc.*, No. 2:16-cv-05769, 2016 WL 9450470, at \*5 (C.D. Cal. Dec. 19, 2016). Accordingly, the court also dismissed the state-law claims. *Id.* The dismissal was entered on December 22, 2016.

---

[2]    By the time the motion was filed, the only defendants left in the case were j2 and AMT. An additional j2 entity, also named as a defendant, was dismissed before the motion was filed. In addition to the standing-based jurisdictional argument, the motion advanced at least seven additional arguments for either dismissal or summary judgment.

Mr. James timely appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(1).

II

We review without deference the ruling before us: the district court's Rule 12(b)(1) dismissal for lack of standing.  *See Chou v. Univ. of Chicago*, 254 F.3d 1347, 1357 (Fed. Cir. 2001); *Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1580 (Fed. Cir. 1993) (citing *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989)).

The district court stated the standard it was applying: "When deciding a Rule 12(b)(1) motion, the court construes all factual disputes in favor of the non-moving party."  *James*, 2016 WL 9450470, at *3 (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)).  We apply the same standard.  "[A]t the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" required for standing, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (internal quotation marks omitted), but "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and alterations omitted).  "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see Ritchie v. Simpson*, 170 F.3d 1092, 1097 (Fed. Cir. 1999).

A

To have Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Defenders of Wildlife*, 504 U.S. at 560–61); *see Chou*, 254 F.3d at 1357. "The benefit of the suit to the plaintiff must relate to the alleged injury." *Huster v. j2 Cloud Servs., Inc.*, 682 F. App'x 910, 914 (Fed. Cir. 2017) (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772–73 (2000)). In conducting the standing analysis, we "assume[] the merits of a litigant's claim and determine[] whether even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (internal quotation marks omitted); *see* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 3531, 3531.4 (3d ed. 2008 & Supp. 2016).

In this case, Mr. James alleges that he is the sole inventor of the inventions claimed in the '638 patent, that sole inventorship entails sole ownership, and that 35 U.S.C. § 256 gives him a cause of action to establish sole inventorship and therefore sole ownership. Subject to an important qualification, if Mr. James were to prevail on those allegations in this case, he would stand to gain concretely, whether through securing an entitlement to seek damages for past acts of infringement or otherwise. Such a gain would be directly related to the merits of the claim and would redress the asserted injury of being deprived of allegedly rightful ownership. In the absence of other facts, that is enough to give Mr. James Article III standing.

The district court did not conclude otherwise. Nor did it depart from the longstanding "basic principle, codified in the Patent Act, that an inventor owns the rights to his invention." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 790 (2011); *see Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996) ("Ownership springs from

invention."). Rather, the court found the straightforward standing logic recited above to be inapplicable in this matter because of the important qualification that "[w]hen the owner of a patent assigns away all rights to the patent, neither he nor his later assignee has a 'concrete financial interest in the patent' that would support standing in a correction of inventorship action." *Trireme Medical, LLC v. AngioScore, Inc.*, 812 F.3d 1050, 1053 (Fed. Cir. 2016) (quoting *Chou*, 254 F.3d at 1359).

According to the district court, the facts indisputably show Mr. James to have done just that—*i.e.*, to have assigned away, or entered into an enforceable agreement to assign away, any ownership rights he may have had in the patent. The correctness of that ruling is the sole issue before us. If the district court was right, then Mr. James lacks standing for want of any concrete interest in securing recognition as the sole inventor of the patent.[3]

The district court held specifically that, even if Mr. James was an inventor (even the sole inventor), he had assigned, or obligated himself to assign, his patent rights to JFAX. *James*, 2016 WL 9450470, at *3–5. The court relied on two related sources for that conclusion: (1) the SDA; and (2) the "hired-to-invent doctrine." Neither source, we conclude, properly supports the conclusion of

---

[3]    We have recognized that, in some circumstances, interests other than ownership may support Article III standing. *See Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015) (recognizing a "concrete and particularized reputational injury" apart from ownership); *Chou*, 254 F.3d at 1359 (recognizing a "concrete financial interest" apart from ownership). But Mr. James has not alleged any benefit he would receive from being named as an inventor, or even as the sole inventor, separate from his claim to be the true owner of the '638 patent. His standing therefore depends on his retention of ownership.

assignment or obligation to assign at this stage of the proceedings.

## B

The district court concluded that "the SDA necessarily precludes plaintiff from retaining ownership of the patent rights." *James*, 2016 WL 9450470, at *5. We disagree. Under the standards appropriate at this stage of the proceedings, which require that "the court construe[] all factual disputes in favor of" Mr. James, *id.* at *3, we cannot conclude that the SDA precludes Mr. James from retaining ownership rights in patents on his inventions—either as itself an assignment or as a contract to assign.

The Patent Act provides that patents and patent applications are "assignable in law by an instrument in writing." 35 U.S.C. § 261. "Although state law governs the interpretation of contracts generally," whether a contract "creates an automatic assignment or merely an obligation to assign" is a matter of federal law. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008); *see Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000). On the automatic-assignment side of the line is a "contract [that] expressly conveys rights in future inventions." *Abraxis*, 625 F.3d at 1364. On the other side of the line is a "mere promise to assign rights in the future." *Id.* at 1365. "In construing the substance of [an alleged] assignment, a court must carefully consider the intention of the parties and the language of the grant." *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007) (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991)).

The SDA is amenable to the construction that it does not assign, or promise to assign, patent rights that would otherwise accrue to Mr. James as an inventor. The dis-

trict court relied in its ultimate analysis on the SDA's preamble, which states that the contract set the terms on which GSP "will develop software solutions for the exclusive use of JFAX Communications." J.A. 53; *see James*, 2016 WL 9450470, at \*5 (rejecting Mr. James's position because it "would, for example, enable plaintiff to license the rights in contravention of JFAX's exclusive use"). But that language is not itself a conveyance of any rights and, in any event, does not clearly go beyond GSP-developed specific software products to encompass also any underlying patentable methods embodied in the specific code. It can be read as indicating that it is only the specific code that will be for JFAX's exclusive use.

The key SDA Section 3 is open to the same interpretation. It provides: "JFAX shall become the sole owner of all code and compiled software solutions as described in this Agreement as soon as it is developed, and GSP shall assign to JFAX all copyright interests in such code and compiled software." J.A. 55. It refers to "code," *i.e.*, sets of instructions, and "compiled software solutions," *i.e.*, the machine-readable ("compiled") translation of the source code that was written in a computer language. *See, e.g.*, *Blueport Co., LLC v. United States*, 533 F.3d 1374, 1377 n.1 (Fed. Cir. 2008) (explaining terminology of "source code" being "compiled" into "object code"); *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 779 (9th Cir. 2002) (same). Indeed, the "compiled software solutions" language suggests that "software solutions"—the term in the SDA preamble—itself refers to the actual code, not underlying patentable methods. It is standard usage to speak of compiling the former, whereas we have been shown nothing to suggest a common, or even acceptable, usage of "compiling a method."

The same conclusion applies to SDA Section 2, which provides: "You agree to develop original software solutions, write original software routines, carry out testing and otherwise provide technological solutions for the

JFAX system, and be responsible for the creation, execution and delivery to JFAX of a series of aspects of those solutions." J.A. 54. That language can be understood as referring only to the actual software and hardware delivered to JFAX, not to ownership rights in any patentable methods or systems invented in creating such products.

Further support for Mr. James's view of the SDA is found in the SDA's express reference to copyrights and complete silence about patents. As already noted, SDA Section 3, after stating that JFAX will become the owner of "all code and compiled software solutions," adds that "GSP shall assign to JFAX all copyright interests in such code and compiled software." Copyright extends only to the expression in source code or its compiled version, *i.e.*, object code, not to the underlying (potentially patentable) methods. *See*, *e.g.*, *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1354–55 (Fed. Cir. 2014); *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 599, 602, 605 (9th Cir. 2000); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 839–40 (Fed. Cir. 1992). Moreover, the operative complaint alleges, with support from documents attached to the complaint, that Mr. James actually executed assignments of copyrights in the specific software for the three systems furnished to JFAX. There is nothing comparable for patents, which are not mentioned at all in the SDA.

We have discussed SDA provisions that either the district court addressed or about which the parties have made substantial arguments concerning the SDA's express contract terms. On that basis, we conclude that the SDA can, and therefore at the present stage of this case must, be construed in Mr. James's favor. So construed, the SDA does not deprive Mr. James of constitutional standing.

C

The district court's second basis for its decision, which is related to the first, likewise does not support the Rule 12(b)(1) dismissal for lack of standing. The court invoked the "hired to invent" doctrine of *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933), and *Standard Parts Co. v. Peck*, 264 U.S. 52, 59–60 (1924). In accordance with those decisions, we have summarized the doctrine as recognizing that an employer may "claim an employee's inventive work where the employer specifically hires or directs the employee to exercise inventive faculties." *Teets*, 83 F.3d at 407 (citing *Dubilier*, 289 U.S. at 187, and *Standard Parts*, 264 U.S. at 59–60). In certain circumstances involving employment, we have explained, "the employee has received full compensation for his or her inventive work." *Id.*

Because this "hired-to-invent" rule is "firmly grounded in the principles of contract law," *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000), its applicability depends on the particular relationship between the "employee" and "employer" in a given case where the rule is invoked. We have said that "[t]o apply this contract principle, a court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights." *Teets*, 83 F.3d at 407; *see also Gellman v. Telular Corp.*, 449 F. App'x 941, 945 (Fed. Cir. 2011) (explaining that the hired-to-invent "doctrine is expressly equitable, and creates only an obligation for the employee to assign to his employer") (citing *Melin v. United States*, 478 F.2d 1210, 1213 (Ct. Cl. 1973)). And we have added that, "[a]s a matter of common law, after the Supreme Court's decision in *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), state contract principles provide the rules for identifying and enforcing implied-in-fact contracts." *Teets*, 83 F.3d at 407 (applying Florida law).

Whether the doctrine is viewed as a matter of federal law or a matter of the state law of implied-in-fact contracts, its applicability in a given case depends on the terms of the contractual relationship of the parties. *See Dubilier*, 289 U.S. at 187 (explaining that the implied assignment of or promise to assign ownership rights "spring[s] from the contract of employment"). Here, there is no dispute that the asserted "employment" is based on the SDA. That contract governed the terms of JFAX's acquisition of the software-development services at issue.

This case involves a distinctive fact not present in the authorities j2 and AMT cite in support of their hired-to-invent argument. Specifically, we have been directed to no decision applying the hired-to-invent principle where the underlying agreement for engagement of services was between two artificial legal entities and to which the inventor was not personally a party. Here, it was the partnership GSP, not alleged inventor Mr. James, that was engaged by JFAX through the SDA. As the case is presented to us, although the operative complaint does not carefully attend to the distinction between Mr. James and GSP, it appears from the SDA, on which j2 and AMT rely, that Mr. James was not himself an "employee" of JFAX or personally hired by JFAX.

Regardless, the SDA does not support a hired-to-invent inference so as to deny standing here. j2 and AMT rely on the terms of the SDA to argue that GSP was engaged, and thus Mr. James was hired, to invent, creating an implied contract to assign resulting inventions. The problem with this argument is essentially the same as the problem we have already identified as defeating the SDA-contract argument for Rule 12(b)(1) dismissal. Based on the provisions and arguments presented to us, the SDA is readily capable of being read *not* to assign or to promise to assign the patent rights at issue. Because the SDA largely or even wholly defines the terms of JFAX's alleged "hiring" of Mr. James (actually of GSP),

there is at least a factual dispute about any implied assignment or promise to assign. And that conclusion, though sufficient on its own case-specific terms, may be further supported by cases recognizing a general legal principle that tightly limits the finding of an implied-in-fact contract where an express contract governs the parties' relationship. *See Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990); *Chase Manhattan Bank v. Iridium Afr. Corp.*, 239 F. Supp. 2d 402, 409 (D. Del. 2002) (citing *Atlas*, 895 F.2d at 754). Accordingly, it was improper to dismiss the case under Rule 12(b)(1) for lack of standing based on the hired-to-invent principle.

## III

For the foregoing reasons, we reverse the district court's order dismissing Mr. James's claims for lack of jurisdiction. We remand the case for further proceedings.

Costs awarded to appellant.

**REVERSED AND REMANDED**